IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

JAINENDRA PRASAD SHARMA,
A71-944-881,
      Petitioner,

      v.

MICHAEL CHERTOFF, Secretary
Dept. of Homeland Security,

EDWARD C. FLORES, Chief of Correction,
Santa Clara County,
Department of Correction;

NANCY ALCANTAR, Field Office Director,
Office of Detention and Removal,
Immigration and Customs Enforcement;

ALBERTO R. GONZALES,
U.S. Attorney General;

      Respondents

Civ. No. 3:07-cv-04692-MJJ

PETITION FOR A WRIT
OF HABEAS CORPUS
PURSUANT TO
28 U.S.C. §2241

---

PETITION FOR A WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2241

## INTRODUCTION

Petitioner, Jainendra Prasad Sharma, by and through undersigned counsel, hereby petitions this Court for a writ of habeas corpus to remedy his unlawful detention, and to enjoin his continued unlawful detention by the Respondents. The Petitioner submits that the Respondents have unlawfully restrained him of his liberty in violation of the Immigration and Nationality Act and the Due Process Clause of the Fifth Amendment to the U.S. Constitution. In support of this petition and complaint for injunctive and declaratory relief, Petitioner alleges as follows:

<u>CUSTODY</u>

1.  Petitioner is in the physical custody of the Department of Homeland Security's Immigration and Customs Enforcement.  He is currently detained at Santa Clara County Main Jail, 150 W. Hedding Street, San Jose, California 95110. Petitioner is under the direct control of the Respondents and their agents.

<u>JURISDICTION</u>

2.  This action arises under the Constitution of the United States, and the Immigration and Nationality Act ("INA"), 8 U.S.C. §1101 *et seq., as amended* by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 1570, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*  This Court has jurisdiction under 28 U.S.C. §2241 and Article I §9, Clause 2 of the United States Constitution ("Suspension Clause"), and 28 U.S.C. §1331, as the Petitioner is presently in custody under color of the authority of the United States, and such custody is in violation of the Constitution, laws, or treaties of the United States.  *See Zadvydas v. Davis*, 533 U.S.678, 121 S. Ct. 2491 (2001).  This Court may grant relief pursuant to 28 U.S.C. §2241, 5 U.S.C. §702, 28 U.S.C. §1361 (Mandamus) and the All Writs Act, 28 U.S.C. §1651.  *See also Magana-Pizano v. INS,* 200 F.3d 603, 609 (9th Cir. 1999) ("28 U.S.C. Sec. 2241 expressly permits the federal courts to grant writs of habeas corpus to aliens when those aliens are in custody in violation of the Constitution or laws or treaties of the United States.").

3.  The Petitioner has not filed a prior writ of habeas corpus either in regard to the detention and restraint complained of herein or in regard to any other detention or restraint.

VENUE

4. Venue lies in the United States District Court, Northern District of California, the judicial district in which the Respondents have exercised custodial control over the Petitioner and where the Petitioner currently resides. 28 U.S.C. §1391(e).

STATEMENT OF FACTS

5. The Petitioner is a 34-year old Indo-Fijian, native and citizen of Fiji. He is also a Hindu priest and belongs to the Sri Sanatan Dharma Saba Hindu organization. He arrived in the United States on or about December 18, 1990 in nonimmigrant student status and has not departed since that initial entry. He is married to Shavila Singh, a naturalized citizen of the United States, since September 7, 2002. Together, they have a daughter, Prisha Ishita Sharma, born on May 19, 2004 in Hayward, California. Shavila has filed an immediate relative visa petition on behalf of the Petitioner, who is otherwise eligible for adjustment of status to permanent residence.

6. Upon entering the U.S., the Petitioner filed an affirmative application for asylum in 1991, well within one year of his entry. The case was referred to the Immigration Judge. The Petitioner was represented by counsel at the time, who advised him that he should accept voluntary departure and not present his application for asylum on the merits. Thus, on July 26, 1994, the Petitioner was granted voluntary departure by an Immigration Judge; as a result, no appeal was filed to the Board of Immigration Appeals. Sometime later, the Petitioner through an immigration consultant, filed a motion to reopen with the IJ, which was denied on August 25, 1995. That denial was never appealed to the Board.

Through new counsel, the Petitioner filed a motion to reopen in February 2007, based on changed country conditions in Fiji, specifically, subsequent to the latest coup in December 2006.

7.  The Ninth Circuit Court of Appeals in *Gafoor v. INS*, provides a historical overview of the history of religious and ethnic relations in Fiji, which form the backdrop for the Petitioner's request for asylum.  231 F.3d 645 (9th Cir. 2000). The Court stated as follows:

> "In 1874, when the British Empire assumed control of Fiji, the country was populated primarily by indigenous Fijians. Beginning in 1879, however, indentured workers from India were brought to Fiji to arm the expanding sugar plantations.  When the importation of indentured workers stopped in the 1920s, a new wave of migrant workers began arriving from India, and by the mid-1960s Indo-Fijians accounted for more than half of the country's population."  *Gafoor,* 231 F.3d at 648.

8.  After Fiji gained independence from Britain in 1970, due to the emigration of Indo-Fijians and an increase in ethnic-Fijian birth rates, the population shifted so that Indo-Fijians were outnumbered by ethnic Fijians.  "Despite their similar size, however, the two groups remained rigidly separate.  Indo-Fijians, overwhelmingly Hindu or Muslim, dominated the economy and professions, while ethnic Fijians, almost exclusively Christian, controlled the nation's military and its political structures."  *Id.*  After two decades of rule by ethnic-Fijians, the voters of Fiji elected the first government dominated by Indo-Fijians in 1987. This administration, however, was ephemeral and promptly erased by military

coups intended to "ensure the political supremacy of the indigenous Fijian people and to protect their traditional way of life and communal control of land." *Id., citing Department of State Country Report on Human Rights Practices.* This "unelected interim government" implemented a new constitution which "effectively wrote Indo-Fijians out of the government, reserving a majority of seats in Parliament for ethnic Fijians, requiring the election of an ethnic Fijian Prime Minister, and ensuring the selection of an ethnic Fijian President[1]." *Id.*

9.  The latest Department of State Country Report on Human Rights Practices for Fiji, states that "[d]eep divisions between indigenous Fijians (54 percent of the population) and Indo-Fijians (38 percent) continued to influence all aspects of the nation's politics." *DOS Report, pg. 1,* March 8, 2006. "Tension between ethnic Fijians and Indo-Fijians has been a longstanding problem" and although the constitution requires that the composition of state services should reflect the ethnic composition of the population, it "also specifies the 'paramountcy of Fijian interests' as a protective principle." *Id., pg. 6.* "There were instances of racial antagonism in Parliament resulting in racial and religious slurs directed in particular against Indo-Fijians. During the year the government pursued a policy of political predominance for ethnic Fijians…Ethnic Fijians communally held more than 80 percent of all land…Virtually all Indo-Fijian farmers were obliged to lease land from ethnic Fijian landowners. Many Indo-Fijians believed that their very limited ability to own land and their subsequent dependency on leased land from indigenous Fijians constituted de facto discrimination against them."

---

[1] The racially based provisions of the constitution were subsequently abolished in 1997.

*Id. See also Faruk v. Ashcroft,* 378 F.3d 940, 941 (9th Cir. 2004) (describing "strong racial tensions in Fiji").

10. In 1999, Mahendra Chaudhry, an ethnic Indian, became Prime Minister. Not surprisingly, shortly thereafter, in May 2000, another coup followed. Prime Minister Chaudhry, Fiji's first ethnic Indian prime minister, and his cabinet were taken hostage by a bankrupt businessman, George Speight and retired Major Ilisoni Ligairi. Chaudhry and the other hostages were released in July 2000 and the Great Council of Chiefs appointed Ratu Josefa Iloilo, a former father-in-law of Speight's brother, president. Elections were held in August 2001 with the result that indigenous Prime Minister Laisenia Qarase being sworn, but refusing to offer cabinet posts to the Indian opposition Labour Party. Qarase won reelection in May 2006 but tensions escalated between him and military chief Frank Bainimarama. Bainimarama was threatened with replacement, which failed, resulting in Qarase going into hiding and in December, 2006, military leader Bainimarama led the nation's fourth coup in 20 years. After seizing power, Bainimarama declared a state of emergency the following day.

11. Commander Frank Bainimarama, after appointing himself as Prime Minister, also reinstated President Ratu Josefa Iloilo as the country's new leader. President Iloilo had been appointed by the Great Council of Chiefs after the military coup in 2000. Significantly, Iloilo is known as a deeply religious man, lay preacher and former Vice President of the Methodist Church of Fiji. Conditions obviously remain unstable and are likely to take a turn for the worse at any given moment. The military coup has been internationally condemned. Australian Prime Minister John Howard has referred to the coup as a "tragic setback" for

6

democracy.  *Fiji military coup is denounced,* BBC News.  Some believe the latest coup will set back Fiji another 20 years.  Ethnic tensions remain high.  The only constant in the history of Fiji is that racial and religious schisms will persist and become further aggravated by conflict.  The latest coup demonstrates that ethnic and religious strife define this country.

12.  Fiji's deep-seated schism extends deep into the realm of religion.  "Racial polarization was reflected in religious differences, which were largely along ethnic lines; this sometimes contributed to political problems.  Most ethnic Fijians were Christians, and most Indo-Fijians were Hindu, with a sizable minority of Muslims. The dominant Methodist Church has closely allied itself with the interests of the pro-indigenous Fijian movement. Break-ins, vandalism, attempted arson, and thefts directed at houses of worship, predominantly Hindu temples, continued to increase. The attacks were broadly viewed as reflections of intercommunal strife."  *Id., pg. 3.    See also Surita v. INS,* 95 F.3d 814, (9th Cir. 1996) (describing persecution of Hindu Petitioner from Fiji and country conditions).

13.  The Department of State's *International Religious Freedom Report 2005* for Fiji confirms that religion runs "largely along ethnic lines," with most indigenous persons, "who constituted approximately 54 percent of the population," as Christian and most Indo-Fijians, an estimated 40 percent of the population, practiced Hinduism, while 20 percent of Indo-Fijians practiced Sunni Islam. "[I]ncidents of sacrilege increased," primarily consisting of "unidentified persons robbing and desecrating Hindu temples."  *Id., pg. 2.*  According to the Hindu American Foundation ("HAF"), Hindus are the third largest religious group in

the world, with over one billion members worldwide. The HAF notes that the dominant Methodist Church of Fiji "repeatedly calls for the creation of a Christian State and has endorsed forceful conversions of Hindus during a previous coup d'etat against a Hindu leader in 1987. Many Fijian Methodist leaders today perpetuate hate and intolerance against Hindus on the island."

14. The head of the Fiji Council of Churches has condemned the coup and Bainimarama's administration, describing it as "illegal and unconstitutional." *Churches condemn Fiji coup government,* December 11, 2006. Ironically, this tension between ethnic Fijians and Indian Fijians is at the center of each of Fiji's four coups. The dominant Methodist church backed the first three coups but not the last coup in December 2006[2]. Some Methodist Church authorities continue to advocate the establishment of a Christian state. The Methodist Church general secretary Reverend Ame Tugaue has expressed concern about the practice of Hinduism in Fiji. *Fiji Times* reported his views on March 27, 2005: "Because if God does get angry with the heathens, Christians will be punished because they allowed the worship of idols and other lesser gods in Fiji. Sodom and Gomorrah were only destroyed after the Lord removed the faithful from there and not because of a few would we allow God's wrath to befall the whole of Fiji. It was clearly stated in the 10 commandments that God gave to Moses that Christians were not allowed to worship any other gods and not to worship idols."

15. The New Nationalist Party in 2003 petitioned President Ratu Josefa Iloilo to stop non-Christians, i.e., Hindus and Muslims from publicly practicing their religion. Party president Saula Telawa stated, "They should not be allowed to practice

---

[2] *The Sydney Morning Herald,* December 7, 2006.

their religion publicly.  If they want to hold a session of Ramayan or other religious activities, they do it inside their homes or if they are living on Freehold land, they can do it there but not on our native land. And no public holidays to mark Hindu and Muslim religious festivals, all this must stop." *Declare Fiji Christian state: Nationalists,* August 23, 2003.  With President Iloilo back in power, the trend toward violence and restriction on the practice of religion for Hindus and other religious minorities is significantly increased. The Petitioner, as a practicing Hindu priest, is at risk for persecution, if returned to Fiji.

16. The Immigration Judge denied the Petitioner's motion to reopen on February 23, 2007.  The Board affirmed the Judge's decision in a final administrative order dated June 6, 2007.  A petition for review was filed challenging this decision.  It is docketed as 07-72347.  At this time, the Certified Administrative Record is due by August 7, 2007 and the Government's response to the Petitioner's stay is due on September 4, 2007.

17. Mr. Singh has been in the custody of the Respondents since January 18, 2007. On April 17, 2007, the Government issued a "Decision to Continue Detention Following File Review," which stated three reasons for holding the Petitioner in custody: (1) "You have been a fugitive at large since August 21, 1995"; (2) "Your removal has been delayed solely through your filing of a Petition for Review with the US Court of Appeals for the Ninth Circuit, resulting in an automatic stay"; and (3) "The Agency is in possession of a valid travel document."

18. Presently, the Petitioner has an automatic, temporary stay of deportation, which protects him from being deported until the Government decides whether it will oppose the stay or not. If the Court grants the stay of deportation, it will

9

continue until issuance of the mandate from the Ninth Circuit at the conclusion of the litigation.

THE PARTIES

19. Respondent Edward C. Flores is the Chief of Correction for the Santa Clara County Department of Correction.   As the administrative head of the Department of Correction, he is the Petitioner's "immediate custodian" and thus a proper Respondent to this proceeding.  *Rumsfeld v. Padilla,* 542 U.S. 426, 434-42, 124 S.Ct. 2711 (2004).

20. Respondent Nancy Alcantar is the Field Office Director for the San Francisco Detention and Removal Office, Immigration and Customs Enforcement.  She is directly charged with the responsibility of determining whether the Petitioner will be detained in the custody of the Department or released pending the conclusion of judicial proceedings.

21. Respondent, Michael Chertoff, is the Secretary for the Department of Homeland Security. He is charged with the administration and enforcement of the Immigration and Nationality Act and all other laws relating to the immigration and naturalization of aliens, provided that the Attorney General's determinations and rulings are controlling.  Given this authority, he is empowered to carry out any administrative order of removal entered against the Petitioner.  *See* 8 U.S.C. §1103(a)(1).

22. Respondent Alberto R. Gonzales is the Attorney General of the United States and is responsible for the administration of the immigration laws under 8 U.S.C. §1103 and the implementation and enforcement of the Immigration and

Nationality Act. As such, he has ultimate legal control and authority over Jainendra Prasad Sharma.

EXHAUSTION OF REMEDIES

23. The Petitioner has exhausted his administrative remedies to the extent required by law, and his only remedy is by way of this judicial action. He has appealed his case to the highest administrative level, the Board of Immigration Appeals and his case is now pending at the Ninth Circuit Court of Appeals pursuant to the authority found at 8 U.S.C. §1252.

24. It is not known or clear how the agency concluded that the Petitioner is a "fugitive at large since August 21, 1995." The Petitioner has been detained now, as stated above, for over six months. Although this exceeds the presumptively reasonable six-month period announced by the Supreme Court, the agency has not based its continuation of detention on the likelihood of the Petitioner's deportation; rather, the agency alleges without explanation, that he has been a fugitive from custody since 1995. This is refuted, however, by the Petitioner's openly living in society under his true name, the same and only name he has ever used before the agency in the deportation proceedings. He has regularly, annually filed income tax returns under the same name that he has used before the agency. He volunteers as a priest at the Ram Krishna Temple. He founded, along with his spouse, Zero Waste Solutions, a company that specializes in recycling and diverting waste from landfills and incinerators. *See* http://www.zerowastesolutions.com/about.htm.

25. Contrary to the agency's suggestion, the Petitioner has lived openly and has not in any way attempted to hide himself from authorities. The agency could have

arrested him in 1995 when it alleges he became a fugitive. The term "fugitive" implies that he has fled, ran away, absconded, disappeared from the jurisdiction; he has not. The agency's decision not to arrest and take him into custody in 1995 is not the Petitioner's fault and cannot fairly be used as a basis for further detaining. He will happily submit to the Intensive Supervision and Appearance Program ("ISAP") pending efforts to deport him. For these reasons, detaining him for six months is unreasonable. Whether under the post-order regulatory detention regime at 8 U.S.C. §1231 or under standard detention principles at 8 U.S.C. §1226, the Petitioner's detention cannot be justified.

26. In the decision to continue the Petitioner in custody, it appears that the Government is uncertain as to what authority it has to hold the Petitioner in custody. The order denying the Petitioner release is schizophrenic in that it cites to both §236, the pre-order detention statute, and §241, the post-order detention statute. The decision states, "Therefore, pursuant to the authority contained in Sections 236 and 241 of the Immigration and Nationality Act, and parts 236 and 241 of the Code of Federal Regulations, I have determined that you shall continue to be detained in the custody of this Agency pending further review."

<u>THE POST–ORDER REGULATORY DETENTION SCHEME</u>

27. INA §241(a)(1)(A), 8 U.S.C. §1231(a)(1)(A) states "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." This so–called "removal period begins on the latest of the following" three circumstances: "The date the order of removal becomes administratively final"; "If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order"; or

12

"If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement."   8 U.S.C. §1231(a)(1)(B)(i)–(iii).  *See also* 8 C.F.R. §241.4(g)(1)(i)(A)–(C).

28. As noted above, the Petitioner is apparently being reviewed and assessed under the post-order regulatory scheme, i.e., 8 U.S.C. §1231(a), INA §241(a), as well as the pre-removal order statute, INA §236.  The decision continuing his detention cites both the pre– and post–order detention statute.   Again, if he is being assessed under §236, the pre-removal order statute, he should be given an individualized bond hearing or released, as he has no criminal history to justify his detention.   On the other hand, if he is being assessed under the post-order statute, his continued detention is  unlawful because the court has "order[ed] a stay of the removal of the alien" and the removal period therefore has not begun. 8 U.S.C. §1231(a)(1)(B)(ii).  *See, e.g., Kothandaraghupathy v. Department of Homeland Security,* 396 F.Supp. 2d 1104, 1107; 2005 U.S. Dist. LEXIS 27043 (U.S.D.C. AZ 2005) ("Although Petitioner is subject to an administratively final order of removal, the 'removal period' has not yet begun because his removal order is currently on appeal to the Ninth Circuit and because the Ninth Circuit has granted Petitioner a stay of his removal.  The 'removal period' will not begin for Petitioner until 'the date of [Ninth Circuit's] final order.").  *See also Sofowora v. Gonzales,* 2006 U.S. Dist. LEXIS 60703 (E.D. CA 2006) (dismissing petition "for lack of ripeness" because "due to the Ninth Circuit's stay of removal, the removal period will not commence until mandate is issued and the stay is lifted");

29. The District Court in *Kothandaraghupathy* concluded "[a]ccordingly," that the "Petitioner's current detention is pursuant to the pre–removal order detention

statute, 8 U.S.C. §1226, rather than the post–removal order detention statute, 8 U.S.C. §1231." *Id.* Similarly, in *Singh v. Crawford, supra,* the Court concluded that the Petitioner fell under the pre-removal order detention statute, i.e., 8 U.S.C. §1226, rather than the post-order detention statute, 8 U.S.C. §1231. For that reason, the Court "recognize[d], however, that Petitioner may have some other basis for challenging the legality of his current detention. Accordingly, the petition will be dismissed with leave to amend to allow Petitioner to present a cognizable claim for habeas corpus relief." *Id.*

30. Because the Petitioner has a stay of deportation, the Petitioner can only be seen as marooned in a legal limbo. If the "removal period" has not begun, then under what authority is he being detained? The only logical conclusion is the one noted above and hinted at in the agency's decision, i.e., that the Petitioner is subject to the provisions of the pre-removal order detention statute, 8 U.S.C. §1226. Under this regime, the Respondents cannot justify further detaining the Petitioner.

<u>DETENTION UNDER 8 U.S.C. §1226</u>

31. "This Court has jurisdiction under 28 U.S.C. §2241 to hear claims challenging section 236 of the INA. Continued detention during the pendency of the INS removal process is subject to review despite the 'sweeping powers' of Congress to prescribe the treatment of aliens." *Lezcano v. Reno,* 2000 U.S. Dist. LEXIS 11686 (ND CA 2000), *citing Parra v. Perryman,* 172 F.3d 954, 957-58 (7th Cir. 1999) (holding that judicial review of section 236 is proper).

32. "Although section 236(e) of the INA 8 U.S.C. §1226(e) states that no court may set aside any action or decision by the Attorney General regarding the detention of any alien, at least one court has held that this does not strip the district court

of jurisdiction to review a petition for habeas corpus based on a challenge to mandatory detention pending removal proceedings because the Act does not contain an express and unequivocal revocation of habeas jurisdiction." *Id., citing Grant v. Zemski,* 54 F.Supp. 2d 437, 441 (E.D. Pa. 1999).

33. 8 U.S.C. §1226 can be viewed as dividing aliens into two categories–criminal aliens subject to mandatory custody under 8 U.S.C. §1226(c) and all other aliens, subject to normal custody considerations under §1226(a).

34.  If the Petitioner is described in §1226(c), then he is subject to mandatory detention and ineligible for release.  If he does not fall into the crevices of that harsh provision, he is eligible for release, or at a minimum, consideration for release, under §1226(a).

35. Under 8 U.S.C. §1226(a), the Attorney General has discretion with respect to the detention of aliens and "may continue to detain the arrested alien" or the Attorney General "may release the alien" on a bond of at least $1,500.  8 U.S.C. §1226(a)(1) and (2).  Precedent Board decisions elucidate the criteria that should be considered in determining the amount and conditions of bond.  Generally, however, bond should be granted unless there is a finding that the individual is a threat to national security or is likely to abscond.  Key to the determination is an assessment of the likelihood that the alien will appear for scheduled hearings.  *See Matter of Patel,* 15 I.&N. Dec. 666 (BIA 1976).  Accepted criteria include: local family ties; prior arrests or convictions; employment or lack thereof; length of time in the U.S.; immoral acts; and financial ability to post bond.  *See, e.g., Matter of Daryoush,* 18 I.&N. Dec. 352 (BIA 1982).

36. Under 8 U.S.C. §1226(c), the Attorney General has no discretion to release certain criminal aliens, the Attorney General "shall take into custody" these aliens. 8 U.S.C. §1226(c)(1). These aliens subject to mandatory custody include those who are: "inadmissible by reason of having committed any offense covered in section 212(a)(2)"; "deportable by reason of having committed any offense covered in section 237(a)(2)(A)(ii)[3], (A)(iii)[4], (B)[5], (C)[6], or (D)[7]"; "deportable under section 237(a)(2)(A)(i)[8] on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year"; or, "inadmissible under section 212(a)(3)(B)[9] or deportable under section 237(a)(4)(B)[10]." 8 U.S.C. §1226(c)(1)(A)–(D). As the Petitioner has no criminal convictions, these provisions do not apply to him.

<u>BOND CONSIDERATIONS APPLIED TO PETITIONER</u>

37. The Petitioner is married to married Shavila Singh, a naturalized citizen of the United States, since September 7, 2002. Together, they have a daughter, Prisha Ishita Sharma, born on May 19, 2004 in Hayward, California. Shavila has filed an immediate relative visa petition on behalf of the Petitioner, who is otherwise eligible for adjustment of status. He is the sole provider for his family and was gainfully employed prior to being detained. There are no significant negative

---

[3] "Multiple criminal convictions…convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct."
[4] Convicted of an "aggravated felony."
[5] Conviction for a violation of "any law or regulation of a State, the United States, or a foreign country relating to a controlled substance."
[6] "Certain firearm offenses."
[7] "Miscellaneous crimes" relating to espionage, sedition, treason, etc.
[8] A crime of moral turpitude "committed within five years" after the date of adjustment of status or admission as a lawful permanent resident for which a sentence of one year or longer may be imposed.
[9] "Terrorist activities."
[10] "Terrorist activities."

factors to justify the Petitioner's continued detention under normal bond principles.

EQUAL ACCESS TO JUSTICE ACT

38. If he prevails, Petitioner will seek attorney's fees and costs under the Equal Access to Justice Act ("EAJA"), *as amended*, 5 U.S.C. §504 and 28 U.S.C. §2412.

CLAIMS FOR RELIEF

*COUNT ONE*<br>*STATUTORY VIOLATION*

39. Petitioner re-alleges and incorporates by reference paragraphs 1 through 38 above.

40. Petitioner's continued detention by the Respondents violates 8 U.S.C. §1226, as there has been no showing that the Petitioner is subject to mandatory detention and there has been no determination, under standard bond principles as elucidated by the Board of Immigration Appeals, that the Petitioner should not be released on a reasonable bond.

*COUNT TWO*<br>*SUBSTANTIVE DUE PROCESS VIOLATION*

41. Petitioner re-alleges and incorporates by reference paragraphs 1 through 40 above.

42. Mr. Sharma's continued detention violates his right to substantive due process by depriving him of his core liberty interest to be free from bodily restraint. The Fifth Amendment's Due Process Clause requires that the deprivation of the Petitioner's liberty be narrowly tailored to serve a compelling government interest. While the Respondents would have a compelling government interest in

17

detaining the Petitioner in order to effect his deportation, that interest pales in comparison to the Petitioner's interest in freedom while he seeks legal, legitimate recourse from removal. "The price for securing a stay of removal should not be continuing incarceration…[Petitioner] should not be effectively punished for pursuing applicable legal remedies." *Oyedeji v. Ashcroft,* 332 F.Supp. 2d 747, 753 (M.D. Pa. 2004). "The fact that the alien has procured a stay of removal does not undermine the bedrock principle that there must be a 'special justification' outweighing the alien's constitutionally-protected interest in liberty, as well as 'adequate procedural protections' to continue incarceration while the alien litigates his claims." *Id., at* 753-54, *citing Zadvydas, at* 690.

43. *Zadvydas* thus interpreted 8 U.S.C. §1231 to allow continued detention only for a period reasonably necessary to secure the alien's removal because any other reading would go beyond the government's articulated interest, to effect the alien's removal. The same considerations apply to an alien under the pre-removal statute, 8 U.S.C. §1226. "Prolonged incarceration for an alien whose potentially meritorious challenge to removal is part of a congested docket is indistinguishable from lengthy incarceration because the alien's native country refused to issue travel documents." *Oyedeji, at* 753. *See also, Ly v. Hansen,* 351 F.3d 263, 269 (6th Cir. 2003) ("*Zadvydas* established that deportable aliens, even those who had already been ordered removed, possess a substantive Fifth Amendment liberty interest, and that the interest was violated by indefinite detention.").

44. Freedom from bodily restraint has always been at the core of the liberty protected by the Fifth Amendment's Due Process Clause. *See also Xi v. U.S. INS,*

298 F.3d 832 (9th Cir. 2002) (extending the Supreme Court's ruling to include inadmissible aliens). "Liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *See Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 18 (1979) (POWELL, J., concurring in part and dissenting in part). *See also Youngberg v. Romeo,* 457 U.S. 307, 316 (1982) ("This interest [in freedom from bodily restraint] survives criminal conviction and incarceration. Similarly, it must also survive involuntary commitment.").

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Petitioner prays that this Court grant the following relief:

1)    Assume jurisdiction over this matter;

2)    Issue a writ of habeas corpus directing the Respondents to immediately schedule the Petitioner for an individualized custody redetermination hearing;

3)    Order Respondents to refrain from transferring the Petitioner out of the jurisdiction during the pendency of these proceedings and while the Petitioner remains in Respondent's custody;

4)    Award to Petitioner reasonable costs and attorney's fees; and

5)    Grant any other and further relief that this Court deems just and proper.

Respectfully submitted this 12th day of September 2007.


/s/ Martin Resendez Guajardo

_____
MARTIN RESENDEZ GUAJARDO
Counsel for the Petitioner
P.O. Box 2087
San Francisco, California 94126
T: (415) 398–3852
F: (415) 296–8730

CERTIFICATE OF SERVICE


I hereby certify that on the 12th of September 2007 I caused to be delivered by U.S. Certified Mail, Return Receipt Requested, a copy of the foregoing PETITION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. §2241 to:


United States Attorney's Office for the Northern District of California
United States Attorney's Office
450 Golden Gate Avenue
11th Floor
San Francisco, CA 94102


/s/ Martin Resendez Guajardo


_____
MARTIN RESENDEZ GUAJARDO
Attorney for Petitioner

20